Good morning judges of the 4th circuit and may it please the court. My name is Richard Cook and I represent the appellant Larry Hurlburt. Section 1322 C2 of the Bankruptcy Code is clear and unambiguous. The statute means what is written. If a home mortgage matures prior to the end of a Chapter 13 plan, that We know the statute is clear for more than a dozen courts that have interpreted the statute to allow cram down in such situations. Only one court has interpreted section 1322 C2 to prevent cram down. This court's panel decision in Witt v. United Companies Lending Court in 1997. I'm here today asking this court to overturn that prior panel opinion as it conflicts with a sister circuit, the 11th Circuit Court of Appeals in Atlanta and the Passion case. I want to apologize to Judge Moss before getting into it. You were on that panel that we generally remember. I'm sorry but that's kind of why we're here today is to overturn this case. The Passion case was what year? 2002 your honor. And you said ours conflicts with theirs? Correct. The Witt case was 1997. It was specifically addressed. The Witt case in the Passion case. Yeah, I think the other way around in it. They conflict with us. I think that's right in the temporal way you say it. Well deep down if I happen to lose here today, this would be an opportunity to actually get my face in front of the Supreme Court because there's still a defined circuit split. The 4th and the 11th clearly conflict on this issue. And we know that the statute itself begins with the preparatory language notwithstanding subsection B2. And so the Supreme Court and it just it's universally accepted the definition of notwithstanding means despite or not affected by. And the court in Witt held that the Nobleman case, the Supreme Court case from 1993, that case Justice Thomas for unanimous court found that section B2 of the bankruptcy code 1322 B2 prevents a home mortgage from being modified in a chapter 13 plan. And that that was limited to 1322 B2. It wasn't done in a vacuum. It doesn't say that all home mortgages in chapter 13 cannot be modified. It says only if it falls within the subsection 1322 B2 that is when it cannot be modified. So Congress the year later in 1994 clearly wrote a statute that says 1322 B2 does not apply to 1322 C. And that's where this statute falls 1322 C to. And so additionally the court in Witt is wrong in that the language of the statute additionally states that you can pay this mortgage as modified under section 1325 A. The language of notwithstanding anything in B2 that doesn't answer this question of the scope of C2. Does it you still have to look at the actual text? Correct. Well what's it assuming the mortgage falls within C2 which would require it to be secured only by the primary resident and it has to mature prior to the end of the chapter 13 plan. That's when it falls within 1322 C2. So it's not it's not seeking to wholesale overrule B2. B2 is absolutely applicable provided it's secured only by the primary residents. You know if there was additional collateral whereby like the homeowners association. Well of Correct. But it's a very it's very limited. Hold on a second. We can all agree on that. And it's kind of this case is a sort of difficult one for me because it depends on the interrelationship of several provisions. One thing that the language of C2 does is it seems to specifically allow modification of payment schedules. And when you look at the language of C2 it begins with which is the last payment on the original payment schedule. Then it talks about due dates and final payments. And it stresses payment schedules throughout. And so it seems clear that B2 is modified to the extent that a chapter 13 plan can modify a mortgage contract that provides for a big balloon payment and stretch out the payment schedules. But the language that specifically addressed payment schedules is quiet on the questions of whether modification and strip down. Your Honor, I think the specific reference to section 1325A5 and that language says it addresses allowed secured claims. And so allowed secured claim is a term of art as used  to look to section 506A to understand what is an allowed secured claim. In 506A it tells us that it's only an allowed secured claim up to the value of the collateral itself. And so we know through the specific reference to 1325A5 that we're dealing with allowed secured claims which has its own separate meaning. And so generally in bankruptcy we're modifying claims. We're not saying modifying payments. Bankruptcy addresses and deals with claims, the filing of claims, the disallowance of claims. And so it's more understandable that we're addressing the claim itself versus payment on the claim itself. And I think the other courts in passion, you know, the Sixth Circuit Bankruptcy Appellate Panel and you banks. But could Congress have specifically a reference of application of strip down in C2 that would seem to be more direct? Well, I think that it's not always going to require a bifurcation. An allowed secured claim could still, there could still be additional collateral. In other words, the case of Perry, Enright Perry, was referenced in the legislative history of 1322C2. In that case, the allowed secured claim was $175,000. The amount that was owed on the mortgage because the home itself was $200,000. And so by referencing 1325A5, you can encompass both mortgages where there's additional equity in the residence. But 1325A5 also addresses payment schedules. The language in 1325A5 talks about making periodic payments in equal monthly amounts, which is a significant modification in and of itself to B2. And so if you have the language of C2 talking about payment schedules, and then in 1325A5, you have language also addressing payment schedules, which requires that they be made in periodic payments in equal monthly amounts. Why wouldn't we interpret those two things in pari materia and at the same time achieve a significant modification of the earlier B2 prohibition against any modification of a home mortgage contract? There's a further subsection still within 1325A5. It's 1325A5B and then II. And it's still part and parcel. There are many aspects to 1325A5. This particular subsection, which is encompassed all within 1325A5 for secured claim, says the value of property to be distributed under the plan on accounts of such claim, and we're still referencing the allowed secured claim, is not less than the allowed amount of such claim. And so it still talks about the amount that you're going to be distributing for that allowed secured claim is still just the allowed amount. And the allowed amount, if we go back to 506A, is still just up to the value of the property itself. Regarding Judge Wilkinson's reference to the word paid, he correctly indicates the need to be specific. In other words, to be given some meaning. The Quid Court found that if you apply the rule of the last antecedent to the section 1322C, then it would rule, it would essentially make that word superfluous. And we shouldn't do that. How do you respond to that? Well, I think, you know, the other courts, Passion and Eubanks and others did address that. And I don't think it makes it superfluous. You still have to make a payment on the claim itself once you modify the claim. So even though, you know, you modify the claim in the bankruptcy, you're still going to have to make payments on the claim itself. So I think adding the word payment there is not superfluous because you're still going to have to pay that claim. Let me follow up on Judge Wynn's good question for a minute in talking about the rule of the last antecedent. Does the rule of the last antecedent apply to the word claim, or does it apply to the phrase payment of the claim? Well, I think it references payment of the claim. Like, we need to be able to, you've paid the claim, and how do we know how we're going to pay the claim? We look to section 1325A5. That's how we're going to end up making payment on the claim. So we really, I guess, to be more specific, Judge Wilkinson, it's really claim. That's the last antecedent, it's claim. That's what's being modified. And so once you have conducted the modification under 1325A5, then we now make payments on that claim modified under 1325A5. And so... What role should legislative history play in this if we found some ambiguity? In a situation like this, Your Honor, I think it... Justice Scalia would say, the late Scalia would say, it shouldn't play any. You know, the legislative history is not voted on by the both houses of Congress. Legislative history is not what is passed and signed into law by the president. What I can say about the legislative history here, Judge Wynn, is that it references the Perry case, 1322C2 was the overall decision in Perry. Perry was the case where that mortgage, there was a foreclosure judgment that made everything due and payable on the mortgage prior to the bankruptcy being filed. Well, you gave me Justice Scalia's opinion. Was that a majority opinion? He's generally in the dissent probably when he's referencing... I'm more interested in what the state of the law is in terms of how that works, not as much respect as I do Justice Scalia's dissenting opinion there. I'm just trying to wrap my mind around that because the Wynn case did look extensively on that once they went and found it there to be an ambiguity. So once we get there, what is the state in terms of how we look at legislative history in this case? I mean, in this particular case, I think legislative history still supports overturning Wynn because the legislative history still specifically references, you know, paying the full amount of the allowed secured claim. So even though legislative history uses that term of art, allowed secured claim, which is understood in bankruptcy of being, you know, it's only allowed up to the value of the property itself. So even in legislative history here, I think that the Wynn court kind of ignored that term of art, allowed secured claim. So I still think here, it just happened that in Perry, the mortgage was, the amount owed on mortgage was less than the complete value of the house. I think if the facts of Perry were different, it would be a lot much more palatable to say, yes, this specifically endorses cram down. But cram down is universally understood through 1325A5. Ashencourt recognized that, you know, Matson, Young, that have all criticized Wynn. And so Congress's specific reference to 1325A5 is what I think is clear. What do we do with legislative history when a court has specifically made the pronouncement, as was done here with the Third Circuit, is what was referenced here, the First National case. And in response, the history appears to override that decision. And that's the force. How do we square that? I mean, I still think that the language of the statute is not ambiguous. So it's one of those, I guess you can sidestep the legislative history if the statute itself is clear. And so I think, you know, the Whitcourt struggled with the fact that, well, you know, you still have the nobleman opinion that predated the statute. The nobleman opinion stated that, you know, if a mortgage falls within 1325, or I'm sorry, 1322B2, you can't modify it. This statute clearly says, notwithstanding section B2, 1322B2. So I think that we don't have to get into the legislative history because I don't believe the statute is ambiguous. Can you, this may be a legislative history question or not, but can you just explain to me why Congress thought this particular sort of subclass of residential mortgages should be accepted from the anti-modification rule? What's special about these mortgages? Some of the understanding was a lot of times they're second mortgages. You know, through the legislative history process, there were iterations of this statute that referenced, you know, primary and junior mortgages. And so the concern was that there may be certain predatory home equities on lenders that were lending in second position with balloons on it, and they figured, and this is referenced throughout the other courts that are critical of when it do reference what they believe to be the section of mortgages that really is focused on 1322C2, is these more for second mortgages. But a predatory loan or mortgage is no less predatory even if the last payment is outside of the five-year term of the plan. So why focus on the balloon payment or the last five years of the plan? Well, I think because in bankruptcy, you only get five years to pay off the mortgage anyway. And so if it extends beyond that, you run into within what date would be too far. I mean, the no woman case, that mortgage actually would not have fallen within 1322C2 because there was still another 20 years left on that mortgage even after their bankruptcy would have been completed. And so I think a lot of it is that the court's just not there. I think it's too cumbersome a situation where if the mortgage payments are extending into the future beyond the end of the plan, like how far do we let those run? Because the debtor is going to have to pay the allowed secured claim in full, whatever it comes out to be. Well, counsel, the reason for no woman talks about B2 and the reason for the anti-modification language in B2 is to ensure the free flow of capital into the mortgage market. And Justice Stevens makes that in his concurring opinion. And so you understand that when you look at the specifics here, this was a proof of claim that was filed for $180,000. And by bifurcation and strip down, Ms. Black, who filed a proof of claim, would realize only $41,000 off of a $180,000 loan. And so she would receive roughly $140,000 less than she's owed. And she still might be able to foreclose. So when you read the facts here, you understand that this kind of thing repeated sufficiently would cause mortgage lenders only to extend mortgage loan to those who represent a very, very small amount of risk who make it conceivably under the reasoning of no woman and the prior B2, much more difficult for young families and middle class wage earners to actually achieve a goal of home mortgages, of home ownership, if they're faced with the routine application of bifurcation and strip down. All I'm suggesting to you is, and I go with the argument, as far as the payment scheduling is concerned and the modification of B2 to that extent, all I'm suggesting is that I think bifurcation and strip down present a closer question for me textually, legislative history, in terms of what no woman was indicating. I'm not sure that these different things are quite the same. The statute still limits the number of mortgages that fall within it. The traditional mortgage in the United States is a 30-year mortgage, or you have a 15-year mortgage. This statute, it only relates to mortgages that have matured or will come due prior to the end of a Chapter 13 plan. A Chapter 13 plan cannot go longer than five years. It's still a limited subset. A traditional mortgage, if a 30-year mortgage was coming due in the next five years, then there would be substantial, you would hope there would be substantial equity in that home, because that would have meant that the debtors were paying on that mortgage for 25 years. I still think that it's, I don't know the time, but I don't believe that this particular statute affects the home lending market. Mr. Cook, you made it clear that your long-term goal is to overturn WIT, and you alluded to going to the Supreme Court if it's not favorable here. But if I correctly understand your brief, we don't really have to get to WIT in some of your main primary argument, because you said even if we interpret that the antecedent of payment is a limitation on modification, Mr. Black has no secure claim to be modified. And to extend it secure, it will be paid within the plan. So we don't really have to reach WIT at all. Is that correct? That's correct, Judge Gregory, in that it's a unique situation in North Carolina in that when a seller of real property, seller finances the home, meaning they retain a security interest, a deed of trust in the property itself, North Carolina, back in the Great Depression, passed a law that prevents a deficiency judgment from a foreclosure of that real property. And so it is possible, the initial argument the whole way has been, you know, WIT doesn't apply, and if it does, it's wrong. But it still feels though, WIT, the holding was very specific. The holding in WIT was, you know, we hold that you cannot bifurcate, bifurcation meaning having a secure and an a Chapter 13 plan in this situation. And so the argument is, under North Carolina law, Mrs. Black can never have an unsecured claim. Her only recourse is the real property itself. And so she will be paid her allowed secured claim, which is the value of the real property. She will never have an unsecured claim. And so WIT's holding was specific. It says, we hold that the debtor cannot bifurcate into a secured and an unsecured. And that's not what, the debtor's doing. The debtor's just trying to pay just the allowed secured claim, that term of art under 506A, the value of the real property, because that's all she would get in the event of a foreclosure anyway. Yeah, I thought it was quite poignant, you know, argument that the property was only appraised at about $60,000 at the time, right? And she got a loan, I guess, all her financing amounted to 130 some thousand dollars. That's correct, Your Honor. And that's why we don't feel that this would have an impact on the home lending market in that, you know, my client is self-employed and his ability to get approved for a home mortgage wasn't possible, wouldn't have been possible. And so that's why he would have to go through, you know, private party seller financing. And so again, that's why we don't feel like this would... Why shouldn't we just wait until the case comes to us that actually impacts the whole thing? This case really doesn't. I mean, for example, we can rule in your favor on the Peculiar Anti-Deficiency Act, and therefore I touched there. Why don't we wait until the... Why shouldn't we wait? Isn't that the normal, the minimalist approach to jurisprudence? It is, Your Honor. What I can say is, you know, the bankruptcy court denied the fact, said which still applies. You know, I've been making the argument that it doesn't apply. Bankruptcy court said it does. District court said it does. You know, the panel opinion that is now vacated said for the reasons stated in the district court opinion and the petition for waived the argument but didn't present the argument that WIT did not apply. The petition for rehearing was focused upon overturning WIT itself because debtors in 45 states can use 1322C2 to cram down a matured home mortgage. It just so happens you can't do it in the five states and the four circuits. Okay. Thank you. Thank you, Your Honor. Mr. Carter? Chief Judge Gregory, judges, good morning. May it please the court. My name is James Carter with the firm of Carter & Carter, and I represent the AFL-E. What I'd like to do this morning is start with Judge Gregory's last question about the North Carolina law and talk about that for the 1322C issue. It's my opinion that if the bankruptcy, if the decision were to allow strip down of the mortgage on the North Carolina law, it would be entirely incorrect. North Carolina law gives the AFL-E, Ms. Black, a promissory note, which is an obligation, a deed of trust to secure that obligation, and nothing under North Carolina law diminishes that obligation. She is entitled under North Carolina law to either get paid the debt or to enforce her rights by virtue of a foreclosure. But the balance doesn't give rise to any impersonal liability on her, does it? No, it doesn't, Your Honor. Ms. Black is not entitled to secure debt at all. That's the whole point. Why should she have more protection in the bankruptcy court than she does in the normal general North Carolina law? Why? It's not secured at all. It's not. The bankrupt has no obligation to pay that amount. So, this plan would pay the secured amount, no strip down, no modification, and the rest really doesn't apply, even if you look at it as a payment reference only. Under the 502 approach, the debtor is not entitled to strip the debt down. She's entitled to be paid or the debtor can agree to abandon the house. And in fact, Pennsylvania Department of Welfare v. Davenport gives her a claim for the full amount in bankruptcy and the other case, which escapes me now, Johnson v. Home State Bank. Isn't that the difference in what you were saying with regard to North Carolina law and the application 1322C is that under the North Carolina law provision, if you go in that direction, your client would have an option to take the property back as opposed to taking a debt. And in fact, I think she wanted to try to get the property back as opposed to taking the debt on it. Well, she really doesn't want the property back at all. It's not worth the amount of the debt. That's why we're here. If she gets the property. But the point being is that the difference is, at least as I understand it, under the bankruptcy proceedings of 1322C, she doesn't get the property back. What she gets is a cramp down position, but she has the option of having the property back because of the North Carolina law, which the anti-deficiency allows her to have is that the approach under North Carolina law and the approach under 1322C2 are entirely different. There is no stripped down ability under 502. So does it follow that you are, to try to follow up on the Chief Judge's questions, does it follow that you do or do not want us to reach the question of the continued vitality of WIPP? I do want you to reach the question of the continued vitality of WIPP. I think it is applicable. I think the WIPP decision was correct. When you say that, is the phrase in the layout secured in 1325A, is the reference, doesn't the reference to an allowed secured claim pose a problem for you if this is a term of art in bankruptcy law? Doesn't that indicate 1325 allows bifurcation and stripped down? 1325A5 allows bifurcation if it's not in a home loan mortgage situation. I have tried to think of these bankruptcy statutes by using a metaphor of a building and with the court's indulgence, I'd just like to take a couple minutes to tell you how I see that they work together. If we have a building, let's say across the street, that is the bankruptcy building, if a debtor walks through the door, the debtor is in bankruptcy. The first thing that the debtor does is the 506A desk. 506 is the statute that allows the debtor to have his or her property value and determine whether it's worth more or less than the secured claim. So the debtor stops at the 506A desk. I have a 506A order here. The debtor stops at the 506A desk and gets a 506A order. Let's say in this case, the value of the property is less than the debt. The debtor then goes to the security guard and there are two departments in this building, in this bankruptcy building. One is the regular secured loan department and that involves automobiles, real estate that's not secured only by the primary residence and the other department is what I call the home loan department. You're talking about a loan that is... So what is your point? Is your point that 1325A applies to loans where bifurcation is possible but also where it's not possible? No, sir. What is your point? My point is that if you go to a regular home loan, you can take the 506A order and use it. If the debtor wants to go to the home loan department, there is a nobleman bar, a nobleman guard that says that the debtor cannot use 506A at the home loan department. Is that 322B? Pardon me? Is that because of 322B? 322B? It's because... 1322B. Yes, it's because... I just want to take your argument and get it to the statute. So you say 1325 allows for bifurcation except for the home loan context. Right. And that's because 1322B says that. That's correct. Then the question is how do you handle 1322C which says notwithstanding B? Well, if you go on down to, first of all, the first part of your question, nobleman in 1993 prevented, it was a direct ruling that a debtor cannot use 506A, strip down the mortgage on a home loan. Nobleman has a long-term debt. We're not talking about a debt within payable within the plan period. Isn't that correct? That's correct. But at that time, nobleman made the broad decision that applied to all loans. There was no distinction between short and long-term. And it still applies potentially to loans that extend beyond that time period. But if there's a statutory provision that makes an exception for shorter-term loans, I mean, certainly Congress has the ability to do that, correct? That's correct. Congress has the ability to do that. If I could complete the metaphor, in the home loan department, there were two debts before 1322C2. There was the debt that was the 1322B2, which does not allow any modification at all. There's a second debt that was 1322B5, which allowed the debtor to procure a default on a long-term loan. Ms. Perry went down there to the department, and she had a short-term loan, went to the 1322B5, and they said, you can't use that here. So she said, I'll use 1322B2 to stretch out the remainder of my payments over the life of the plan. Perry was not about lien stripping at all. Perry was about a fully secured debt. And the 1322B2 was going to pull the rug out from under her, and she would lose the equity in her house because she did not have the ability to catch up or pay the remainder of the debt over the period of the plan. Yeah, and C1 cures that situation. It gives her the right to pay up until the time the property is sold. But we're talking about C2, and what does it mean? C1 and C2 work in tandem. You're right. C1 says, sets the date beyond which the debtor cannot deaccelerate the loan. C2 says what the debtor can do if they have a short-term loan, and I'll use the example, that has been accelerated. And it was, and Congress didn't like Perry, and Congress crafted C2 right straight out of the Perry opinion. They used the same analysis that Perry used. They used the same statutes that Perry used. And all they did was change the result. Perry held, Perry analyzed 1322B2 versus 1325A5. And Perry specifically said that the debtor cannot, that 1322 prevents the debtor from modifying the loan under 1325A. If we listen to it, this is not the wording of Perry. Perry said 1325A was irrelevant. Perry held that because of 1322B2, the debtor cannot use 1325 to make payments. Congress simply, Congress addressed Perry. They simply switched the language, and instead of saying because of 1322B2, the debtor cannot use it, it said notwithstanding 1322, the debtor can use 1325. They cited the same statutes that Perry cited. They just simply did not like the result, and they reversed it. Well, Mr. Carr, let me ask you, under your view, the debtor's plan would give your client a secure claim equal to the value of the indebtedness. Does that... No, Your Honor. No. What would it be? If the debtor cannot strip the loan down, my client has a claim for the full amount. Well, isn't that the amount of the indebtedness? Yes. I'm sorry. Maybe I misunderstood your question. So you would have, your view would be that in order for her plan to, the debtor's plan to be confirmed, there would have to be an agreement by the debtor to accept a secure debt in the full amount of the indebtedness. Either that or there would be some resolution of it in the claim. Well, either Chief Judge Gregory or Judge Wilkinson made some reference to the tax value of the property when the house was sold. This is beyond the record, but in North Carolina, the tax appraisal, the tax office only appraised property every eight years. And we were at the tail end of eight years, so the tax value is not at all equivalent to or have any relationship to the true value of the property. That's an aside. So under your theory, just looking at it from a debtor's economic standpoint, why would they agree to pay this enormous amount of debt when the property is only worth a fraction of what that indebtedness is? I don't think they would. So you're back to where you would be under North Carolina law, right? That's correct. It seems like we're kind of going in a circle here. Well, from a practical standpoint, it'll probably end up in the right place. But what I'm saying to this court is that what was decided right in the 1325 reference was not to strip down. 1325 has two sides to it. One is the strip down side. The other is the payments over time side. And Perry was addressing the payments over time side. The Congressional Committee reports indicated, they said that they were reversing Perry so that the debtor did not have to make, quote, immediate payment on the debt. So that's exactly what they were doing. But so that would mean that the reference in C-2 to A-5 refers to the specific subsection of A-5 that pertains to payments. Payments over time. But it doesn't do that. It refers to the A-5 as a whole, which has both, if you correctly know, the ability to modify payments, but also to strip down. That's correct. It does not specify. Well, if it was limited to payments, as you argue, why wouldn't Congress have limited it to the subsection that talks about payments? Because I think they crafted the language addressing the specific statutes that Perry was addressing. The other, if I didn't come here to quote the cases, but as far as the legislative intent, there are two Fourth Circuit cases that help us and answer Judge Wynn's question about why we can't look at the legislative history. First one is the Merrigan, both of them are bankruptcy cases. The first one is the Merrigan case in 1999. It says, when the plain meaning, excuse me a minute. When the plain meaning is ambiguous, we must resort to the policy and purpose behind the legislation. And in 2016, in our Anderson versus Hancock case, it said, while the text is the law, legislative history that shows the genesis and the evolution can sometimes give a clue to the meaning of the text. Judge Baldwin, you're correct. The statute does not distinguish between the strip down side of A5 and the payment over time of A5. But Congress did. And I don't believe it was in Section 305 of the Bankruptcy Reform Act that became 1322 C2. You would have us limit the statute then based on what you think Congress was intending to do rather than what the text says. The text doesn't limit it. The reference, the text does not distinguish. But here's what was going on. The House and the Senate had Section 301 of their bill, which became 1322 C2. As Whit said, not once in there did they mention no one or strip down or bifurcation. At the same time, in this 1994 act, the Senate had a bill- C2. In other words, it captured more than they had intended based on the discussions. It seems to me the Supreme Court has told us we stick Congress with what they said. And if they want to fix it or refine it, they can do that. We actually had a case where it looked like there was an error in the statute. And we concluded that they're stuck with their error and they can fix it. And the Supreme Court affirmed that. And so I worry that if the statute includes all of A5 and we limit it because of the discussion that was taking place in Congress, we're ignoring the text and going behind it and modifying the text to accommodate the discussion. Well, none of us like the word ambiguous because when we read something, we know how we understand it. But I think 1325A is ambiguous. The only reason I can say that is because the Duesmith case, which is not a Chapter 13 case, said the word claim was ambiguous. I don't think claim is ambiguous, but it can be interpreted as- I'm still not satisfied with your response to Judge Qualbaum's good question. He asked you why the reference to 1325 was not specifically to the sections of 1325A directly related to payments. I wasn't sure why, if your position prevailed, wouldn't the reference to 1325A have been more specific to the provisions of 1325A dealing with the need to make periodic monthly payments in equal amounts? Why should we take that reference to 1325A to apply just to that particular part of 1325A dealing with periodic payments in equal amounts as opposed to the whole of 1325A, which does prohibit bifurcation and strip down? Why should that be a targeted reference rather than a general reference? Judge Qualbaum posed that question to you, and I'm still waiting for an answer. I think there are two reasons, Your Honor. I think the first reason is because 1322C2 was about payments, as the witness even said, and phrased payment of the claim as modified. So is your answer that as modified, for the payment of the claim as modified, is your answer that payment of the claim does, in fact, address that part of 1325A directed toward the periodic payments in equal amounts? Yes, Your Honor. Well, if that's your answer, is that a rather oblique way of expressing it? Well, I think they could have expressed it better, yes, Your Honor. But I think since they crafted the back of the period decision, that was about payments. And I think the Congress crafted that statute, C2, about payments. So you're hanging your hat on the word payment, and the word payment links up with the payment term set forth in 1325A? Yes. Go ahead. Sorry, go ahead. No, finish. When my dear colleague, Judge Wynn, aptly pointed out your client's recourse in North Carolina would be foreclosure, and I think you said, correct me if I'm wrong, we don't want to foreclose. Did you say that? That's not her first preference. That's correct. Okay, all right. But bankruptcy is about the bankrupt's estate, right, in terms of trying to find out a new start and secure creditors and non-secured creditors and order and payment and new start. It seems to me what you're trying to do is take the whole amount owed and make it a secure debt so that you can get in front of other secured creditors or unsecured creditors. We would not get in front of anybody, Your Honor, because there's no equity in the property. But you wanted to be a debt paid in front of other debts, right? Forget about the equity in the property. You wanted to be a debt that's there that's perhaps discharged, not discharged, but that she has to pay. So why should bankruptcy code be used to put in a debt that there's no impersonal liability for and then somehow now becomes a secured, all of it, and the bankrupt, and then it becomes a secured creditor claim, the whole thing, not just what you're left to in the North Carolina law as foreclosure. Why should, doesn't that defeat the purpose of bankruptcy and looking at the property of a bankrupt and trying to get a new start? Can you answer that? I'll do my best to answer it. First of all, I represent debtors and creditors in my practice, and the bankruptcy code is a balanced debtor and creditor law. And it protects both debtors and creditors as best it can. That's why we try to correctly put secured and unsecured creditors in the right place and those who are creditors of the estate of the bankrupt person and those who aren't. That's why proof of claims are required. You're right, it is a balance, but go ahead. I understand that. And in this case, as it has been from the beginning of the bankruptcy code in 78, the home loans, loans secured solely by the debtor's presence, have enjoyed a special class so that they would not be written down. Mrs. Black has a secured claim. She has a secured claim for the full amount unless this court says that bifurcation is appropriate on 1322 C2. But it then qualifies a long-term home mortgage debt to get the protection of B2. That's correct. It does not. So therefore, you're relying upon C2 in terms of whether or not she's in that class. Yes. Right. And going back to the Congress's intent, I was going to mention that separate Section 306 in the Senate bill which proposed lien stripping in the 1994 Act. And it proposed lien stripping where lien stripping would be the right place to reference in Section 1322 B. And the congressional comments to the Senate bill were that we want to clear up the issue about lien stripping. They mentioned the Nobleman case, which the final bill did not mention it. They mentioned 506 C, and the proposed statute proposed some modified lien stripping on junior mortgages for home loans. The House was not willing to go along with that bill because the intent at that time was to tighten down on anti-modification rather than to expand it. In 1994, Congress added a section to Chapter 11 which imported 1322 B2, the anti-modification provision, and put it in Chapter 11, making it more, making it harder to strip down. It did not go along with the strip down provision in the Senate bill because they were not of a mind to expand lien stripping on home loan mortgages. So what I'm saying is the contrast between the two and how it developed shows us that 1322 C2 was not about lien stripping. President, go ahead. In your brief, at least twice, you cite a law review article and commentator. I'm sorry. In your brief, you twice cite a law review article and indicate it's from a commentator. It turns out it's from a student note. And there are two pretty extensive, you make two poignant quotes from that article for very significant points, one of which is that Nobleman supports your interpretation of how we should look at Nobleman, but no other court that I know of has gone in that direction. Do you have any other authority other than that student note that you quote to us without identifying it as such? No, sir. I have not found another case which agrees with that. That must be some student. Thank you. As I understand, the bottom line of your view of 1322 C2 is that what the debtor would get to in this case, instead of having a balloon payment as the secured indebtedness, she would get, depending on the length of her plan, three to five years, that period of time to pay it out. Is that your position? Correct. So if we go back to putting bankruptcy, put bankruptcy aside, and you're just proceeding under North Carolina law, you have a, in effect, a security interest for whatever you're going to get at the foreclosure. Correct. And everything else is non-recourse debt. Correct. It's gone. You have no way to recover that. I assume in bankruptcy you would take the position, if the debtor's position prevailed, that you would have a security interest for that same amount, and then you would have a separate unsecured claim in the pot with all the other unsecured claims. No, sir. I don't believe she would be entitled to an unsecured claim. So... Well, if you're bankrupt, she would. No, I thought your brief argued that. I'm arguing against my client's interest, but under 502 B1, it says that claims are allowed unless they're disallowed under state law. And under state law, she is not entitled to an unsecured claim. So I do not believe that she would be entitled to an unsecured claim in bankruptcy. But isn't that only applicable if she sees... Sorry, I'm over here. Isn't that only true after a foreclosure? In the anti-deficiency statute of North Carolina, only applicable after foreclosure? That's correct, Your Honor. And in this case, there has been no foreclosure perceived. That's correct. So, I mean, on its face, the statute doesn't apply. The North Carolina statute doesn't apply. That's correct. But the end result is bankruptcy wouldn't discharge it. It wouldn't discharge that debt. The bankruptcy would discharge it. That's what... not the unsecured debt. Under your interpretation, the additional amount she's seeking, you want that debt to remain. No, sir. So you just wanted to have $40,000? No, sir. I don't want her just to have $40,000. We think the property is worth more than that. And we... Tell us what you want. Maybe that's the confusion here. What is it you are seeking for your client? $66,000. Not $181,000? No, sir. Well, you're fighting over 506 valuation of the claim, right? That's what you're really... You think it should be a high appraisal rate of the part that everybody agrees is secure. That's the only thing that you're talking about? That's correct. You don't even touch with them, really. You don't need to deal with it at all. You just need to fight very hard to prevail on the value of it. Because the other side is not saying that part of it isn't, I suppose. So we are arguing over appraisals, right? Comparable sales and those kind of things. The practical standpoint, that's right. Is that $66,000 number in the record here?  No, sir. It's not in the record. It's the first time that number has been revealed. Well, the debtor knows about it. Yeah. Okay. Well, we didn't know about it right now. We are arguing over something that we don't even know what the facts are. That's really the gravamen of the real issue. That's interesting to get this going on. The parties agree. Is the $66,000 issue on appeal? Has there been a determination about valuation? There's been no determination. I'd like to come back to that. One of the things that concerns me is there's a danger in this case of getting lost in the weeds. And you've got a lot of weeds around you. And I want you to just explain your theory of why, what exactly it is that C2 accomplishes and why textually you think it accomplishes that. As to the House bill and the Senate bill and this and that, so many of these cases have concentrated on legislative history. But I'm interested in the text. What do you think the text of C2 did and why? What language in the text, either of C2 or 1325, do you point to as the linchpin of your position? That C2 allows the debtor to make payments of the claim over the period of the plan. That's what I think C2 says. And I think C2 does not overrule nobleman in any way, shape, or form to allow a linchpin. And what in the text supports your view? I know that's your conclusion. But what in the text of the bankruptcy statute supports your view? What language? What words? The wording of payment of the claim. Of the claim is a prepositional phrase. It belongs to the word payment. It's a possessive prepositional phrase which ties it to payment. It's like if we were going to change the color of a car, we'd say the car's color has changed. But why couldn't payment of the claim apply to something more than just scheduling? Because I think it was not Congress's intent to allow linchpin. How do we know that? Because they had a separate bill proposing linchpin and that was scrapped from the law. Is there any other language in C2 that you're allowing? Well, in the beginning of C2, they used the term a claim secured by, rather than a secured claim and an allowed secured claim. According to DUSNIP, according to nobleman, according to 506A, when you use a claim secured by, it's talking about the home claim as opposed to the secured claim or allowed secured claim. Can I ask one more question? Okay, so it seems like to me when you get down to the end of the day, tell me if I'm wrong about this. The difference between your position and the debtor in practical terms is you want the debtor to pay over the terms of the plan based on a dollar amount that has yet to be determined. And the debtor wants to pay over the period of the plan over a dollar amount that has yet to be determined. That's correct. The fair market value of the property. So what does 1322 C2 or B or any, what does all the argument we've had here have to do with this bottom line issue? Isn't it just a valuation decision the bankruptcy court has yet to make? It boils down to that, yes. So we would be issuing an advisory opinion then if we were to discuss the ambiguity in 1322? I guess you would. This is totally a surprise. I think it's different from your brief. As I understood your brief and your legal position, it was that the entire indebtedness, $180,000 is secured by the property. It is. And that the plan would have to include payment of the $180,000 in order to release the security. It would have to unless there was a resolution between the parties. We're not talking about resolutions. We're talking about mandatory. Well, that's totally different from this recent business of we're waiting for evaluations. You want $180,000 paid as a secured claim over the period of the plan. Correct. You told me just the opposite five minutes ago. My answer to him was that's what the demand, that's what the law says as I understand it. He said, do you want $180,000? You said yes, but you said earlier you wanted $66,000. Well, I misspoke to him then. Well, to whom? That's inconsistent. That's inconsistent with your brief. It's inconsistent with your brief and your legal position. Your legal position and your brief say you want the entire indebtedness paid during the course of the plan because the entire indebtedness is secured. Your Honor, I don't see it that way. I see that my brief said that we're entitled to that. Yes, and that's what we're arguing in bank. In other words, this whole notion of you would agree to a $66,000 number, that's a negotiation for settlement, but that's not a legal position. The legal position is can your $180,000 be stripped down to have a $66,000 or $47,000 or whatever it is secured claim and the balance unsecured, or is the entire $180,000 secured and have to be addressed by the plan? That's a correct statement, yes. Well, that's what I thought the issue was. I was trying to answer Judge Nguyen honestly, but our position is that they're not entitled to strip it down. And so the claim is $180,000 secured by the property? Yes. All right. But you want an advisory opinion. Both of you, you and your colleague there, on the other side, agree that you want the main bank court to give you an advisory opinion, which sounds to me like you said in bank court you need a mediator. Well, I'm not sure I can speak for him. He may disagree, but I think it was both of our understanding that we would not waste money on a valuation hearing until we had a ruling on this issue. I missed that part of it. It was a sound there. You want to waste time on a what kind of opinion? Valuation hearing. Valuation hearing, okay. So this property down in the Wilmington area, I take it it's not anywhere near water? No, sir. Okay, I'm sorry. Maybe not. My time is out if I am close enough to make one request. I think WIC should be upheld. But this court has the authority and the absolute discretion to, if it reverses WIC, to make the decision prospective rather than retroactive. You know, the trouble with all of this is we have nothing to function in the way you're going here at the end of your argument. We came in understanding that you were making a claim that the entire $180,000 debt is secured by the house, and you agree that's what your claim is. And you base that on WIC. And the other side says C-2 allows for a bifurcation. And that's the legal question. Now, whether you're prepared to resolve this case on some intent to your client or a valuation that's not in the record is not even before us. We're not speculating about how you would reach an agreement. You should have reached that agreement long ago. You're right. I didn't appeal this case. Well, I understand. But your legal position is that the entire indebtedness, $180,000, is secured by the house. Correct. And it has to be addressed by the plan. And that's the legal issue before us. Now, how do you take that away from us? Your brief doesn't back off of that claim, does it? And you rely on WIC in order to make that claim. But you had to answer questions that were given to you here truthfully. And accurately. And you did. And I admire that. Well, thank you, Your Honor. I did. I feel like I have to be completely direct and honest. I appreciate that. All right. Thank you. What I was saying is that... Go ahead. Mrs. Black parted with this money when the law in this circuit said that her leave could not be stripped down. And if the court reverses with and allows leave stripped under 1322 C2, I do not think it would be fair or equitable to apply that to her situation. I'm sorry. My mouth is dry. I would ask that the court make it prospective rather than retrospective. All right. Thank you. I think we understand your point. Thank you. Mr. Cook, do you have some time? So I think... Let me ask you before you get started. So you can represent to the court, assume that there's been no finding in the bankruptcy court as to the value of the property. Correct. And Judge Humrich House will not hold a valuation hearing because of the ruling in WIT. WIT prohibits the bankruptcy court from valuing the real property because... I was just asking the factual question about that. So is your understanding of the creditor's claim that in terms of your client's plan, that the creditor claims a security interest to be paid out in the full amount, 180 some thousand dollars, and without that, they would argue the plan should not be confirmed? That's correct. Okay. There's been no discussion of the $66,000? There has not, Your Honor. And what I can say is... Well, really? Because there was a representation by the other side that... There have been... Can I ask a question? And then you can answer it. There was a representation that you did know about that amount. And since we've had such great candor from the other side, I would be surprised if that's not the case. But you tell me you've never heard it before. I have heard it in that it is the appraisal from Mrs. Black that she obtained on that property. But my clients have not agreed. No, it wasn't agreed. It was whether there had been discussion. I thought you started out by saying, well, we couldn't agree on an appraisal because a bankruptcy judge won't consider it because of which. Is that your position? No. What I'm saying is the court will not hold a valuation hearing. I mean, if the parties... And that's part of 1325A5 is that if the parties agree to that plan treatment for the secured claim, then absolutely. But it also... have the valuation hearing itself. The bankruptcy court would have to find that this is a mortgage subject to modification and to cram down. And 1322C2, in accordance with WIT, says you can't have that valuation hearing, have that cram down. I understand you couldn't have the valuation hearing, but you could have agreed on a valuation. Maybe there were negotiations about that. Correct. It has come to nothing. Correct. That's exactly right. And that's why there would not just need to be an advisory opinion here in that, you know, bankruptcy court itself needs to have a ruling on whether WIT is still going to be good law or not in order to then... If WIT is overturned, that would be the next step in the bankruptcy court, is going back to the bankruptcy court, holding that valuation hearing, so then we can determine a value, the actual allowed secured claim, the term of art under the bankruptcy codes. That way, that allowed secured claim can be addressed in a... It's still an advisory opinion you're asking for, though. No, Your Honor. Well, you said the bankruptcy court has to have a ruling on whether WIT's the law. So it can decide something, but WIT is the law. We haven't decided anything of the contrary. I apologize, Your Honor. The bankruptcy court did rule that because of WIT, you know, the debtor, it fought an adversary proceeding to determine the secured status, the ability to cram down the real property. The bankruptcy court entered a summary judgment against my clients because of WIT saying, no, you cannot cram down. We cannot have a valuation hearing. And so, you know, there won't be a valuation hearing, I guess, if WIT is upheld and the Supreme Court itself will not grant, you know, a petition for cert. So, correct, and there won't be a valuation hearing at that point. That's a broad reading. That's a broad reading of WIT. And you must say that you disagree with it, but everybody agrees that WIT talks about payment, and it does refer to 1325, as more than bifurcation and cram down. If, for example, if you want to modify payments, you have to find out what is the starting point, what that value is, and then you modify the payments to it. Nothing in WIT prevents the court from doing that. It doesn't have cram down, bifurcation, or bifurcation. It seems to me that the most direct thing for us to do would be to reverse that vote. That's the basis upon which the bankruptcy court. I mean, and following up on what Judge Motz is saying, what is there to bifurcate here with North Carolina being a non-recourse state? Well, don't you have to have the determination of value, and then the rest of the loan goes away? That's correct, Your Honor, and that was our, that's our initial argument is that WIT didn't even apply. That's what, yeah, yeah. The initial argument is that, granted, that was not part of the petition for rehearing on BOTS, but, you know, the three-judge panel that had affirmed the district court where we lost, you know, did not, it rejected that argument similar to how the district court rejected the argument, but, you know, we still contend that WIT has no application in this case. It was a very specific holding. It says you can't bifurcate into a security. You don't want us to, you don't want us to overrule WIT. You said it has nothing to do with it. Well, if, I guess it's the, what's the argument in the alternative? If WIT does not apply, then correct, then, you know, the district court and both the bankruptcy court need to be reversed because it doesn't, because the planned treatment that we proposed does not run afoul of WIT, but if WIT happens to apply, then we would want it overruled and thrown out, and just to backtrack, Judge Richardson, you asked a question about whether the anti-deficiency statute applies pre- or post-foreclosure. North Carolina Supreme Court has actually been clear. It also applies pre-foreclosure. There are parties who try to sue on the promissory note prior to the foreclosure itself, and the courts have found that that's not proper, and so at all times, it is an anti-deficiency statute, and so there is nothing held beyond the actual lien on the property itself, so there still couldn't be some in-person liability prior to an actual foreclosure. Counsel, I had perhaps read, the opposing counsel's read brief incorrectly. I had read it to indicate that if you prevailed on the strip-down argument, that the creditor would then have a unsecured claim in the bankruptcy, but they indicated today that's not the case. Is that your understanding as well? That's correct, Your Honor, because 502b1, a claim is allowed but for, unless it's disallowed under applicable law, applicable law would be state law in North Carolina, and North Carolina does not recognize the deficiency. So application of the North Carolina state law would resolve this case without ever mentioning it? Well, the bankruptcy court and both the district courts still thought that, they still thought it was a modification, and so it still saw it as, with what Witt said, a bifurcation, a modification, and so like I said, I've been arguing since day one with the filing of the amnesty proceeding that Witt had no application. But you sought an opinion that would say, correct me if I'm wrong, that would say that the application of North Carolina law does not implicate Witt, and therefore you have simply whatever the security interest is in this property is a matter of state law, and the rest is a non-recourse debt that disappears. That's correct, Your Honor, and the bankruptcy court rejected that argument, district court additionally rejected that argument. But that relief in this case would obviously be binding on the courts below, so that resolves this case, it may not solve the issue of Witt, probably in other cases. It would leave Witt for another day. What I can say is that I guess there would be another way around Witt in that it's something colloquially called a Chapter 20 bankruptcy, where a debtor can file a Chapter 7, receive a discharge of their debt, and then file a subsequent Chapter 13 to where now that it becomes a non-recourse mortgage, because the in-persona liability on the promissory note itself was discharged in a 7, and so there couldn't be an unsecured deficiency claim in that new Chapter 13, so it would probably encourage, I guess, debtors to get around whether you'd be filing the 7 followed up by a Chapter 13. You mentioned at the end of your argument that Witt poses a problem not just in North Carolina, but in the other four states in our circuit. Are you familiar with whether or not there are similar anti-deficiency statutes in those states that would yield a similar result? I'm not, Judge, yes. So I guess Witt would remain a problem, in your view, in those other states. Absolutely, and it still creates a problem even for mortgages. The bankruptcy courts have grappled with this in that modification, even if altering an interest rate, so even with mortgages where the middle district of North Carolina, the bankruptcy courts there, with a matured mortgage, even if it's being paid in full, of course Witt there said, well, modification, Witt says we can't modify at all, therefore, we can't even change the interest rate on the loan. Why can't we wait and just take that case up when we get to it? Absolutely, I mean, if you're willing to find that Witt doesn't apply and my client wins, I agree. Let me answer this, because I think the way you interpret this, you might ruin your bankruptcy court career. The bankruptcy court below decided that on Witt, you argued adversely. You then bring the petition here on Witt matter. If we overrule Witt, does that preclude you from arguing North Carolina law below? Well, I mean, the fact that we overrule it, if it doesn't apply, does that preclude the argument below when it goes back? All that you've said. I don't believe so, Your Honor. It just means that we can follow the statute 1322C2 as Witt, meaning that we go through the analysis under 1325A5, and we still have an evaluation hearing. We determine what is the allowed, secured claim of the property. I think we'll end up there regardless. So if we win based on Witt not applying, we'll have an evaluation hearing to determine what is the allowed, secured claim. And both parties can argue North Carolina law, notwithstanding Witt, saying it doesn't apply one way or the other, if they choose, or the court can proceed and say Witt does. Correct. And the preparatory language of 1322C does specify, notwithstanding section B2, but it also says notwithstanding applicable non-bankruptcy law. So it does encompass both. So it still can disregard state law, but that is contrary to the 1322C2 as well. Thank you, judges. The district court be reversed. Thank you so much. We'll ask the court to recess the court. We'll come back and re-counsel.
judges: Gregory, Wilkinson, Niemeyer, Motz, King, Agee, Keenan, Wynn, Diaz, Floyd, Thacker, Harris, Richardson, Quattlebaum